**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**Lisa M. Bruso**

       **v.**                                        **Case No. 04-CV-240-PB**

**Jo Anne Barnhart, Commissioner,
Social Security Administration**

**MEMORANDUM AND ORDER**

Pursuant to 42 U.S.C. § 405(g), Lisa M. Bruso challenges the Commissioner of the Social Security Administration's determination that she was not disabled prior to September 9, 2002.  The Commissioner objects.  For the reasons set forth below, I deny Bruso's motion to reverse the Commissioner's determination and grant the motion to affirm.

**I. BACKGROUND**[1]

**A.   Procedural History**

On April 24, 2001, Bruso filed an application for disability

_____

[1]  The background facts set forth herein are taken from the Joint Statement of Material Facts (Doc. No. 9) submitted by the parties.

insurance benefits ("DIB") with the Social Security

Administration ("SSA") alleging a disability onset date of April

12, 2000.  Transcript ("Tr.") 185.  On December 6, 2001, the

Commissioner denied her application.  Tr. 121-124.  Bruso

responded by filing a timely request for a hearing before an

Administrative Law Judge ("ALJ").  Tr. 125.

On October 31, 2002, following the requested hearing, ALJ

Frederick Harap affirmed the Commissioner's denial on the grounds

that Bruso did not qualify as disabled under 42 U.S.C. § 416 and

§ 423(a)(1), respectively.  Tr. 105-114.  Bruso appealed this

decision and the Appeals Council subsequently remanded for

further evaluation and consideration of new evidence.  Tr. 119-

120.  The new evidence, a cervical MRI conducted on September 9,

2002, indicated that Bruso had severe spinal stenosis[2] at C5-C6

with bilateral neural foraminal narrowing and impingement of the

spinal cord.  Tr. 318.

On December 24, 2003, the ALJ held that, in light of this

new evidence, Bruso had in fact been disabled as of September 9,

---

[2]  Spinal stenosis is the narrowing, or stricture, of the
vertebral column.  See Stedman's Medical Dictionary ("Stedman's")
1450, 1473 (25th ed. 1990).

2002, but that she had failed to establish her disability prior to that date.  Tr. 26.  Because the Appeals Council denied a subsequent request for review on May 28, 2004, the ALJ's holding became the final judgment of the Commissioner.  Tr. 7.  Bruso now seeks review of that judgment under § 205(g) of the Social Security Act.  See 42 U.S.C. § 405(g).

**B.   Bruso's Medical History**

Bruso, a 42 year-old resident of Hopkinton, was employed by the New Hampshire State Hospital as a switchboard operator until April 2000, when she quit after her hours were dramatically decreased.  Tr. 75.  Bruso claims her hours had been limited by management in response to her excessive use of sick leave.  Id.

Bruso's use of sick leave was precipitated by a back injury she suffered in a 1994 work-related accident.  Tr. 16. Conservative treatment for that injury initially proved successful and she was able to quickly return to work.  Id. Indeed, Bruso did not seek further treatment until February 10, 2000.

At that time, Bruso sought treatment from Dr. Susan Bayer

for otitis[3], bronchitis, intermittent back pain, and depression.
Tr. 228.  After diagnosing Bruso with chronic back pain, insomnia
secondary to depression, otitis, and bronchitis, Dr. Bayer
prescribed Ativan, for anxiety, and Wellbutrin, to combat the
depression.  Id.  Bruso failed to return for follow-up care.  Id.

Bruso saw Dr. Bayer again on March 22, 2001, complaining of
frequent bowel movements, rectal bleeding, left elbow pain, neck
pain, and back pain.  Tr. 229.  A physical examination revealed
some point tenderness in Bruso's left elbow, but no severe
injuries.  Id.  Dr. Bayer described Bruso's affect during the
examination as "slightly anxious, but in no acute distress,"
though she also noted that Bruso had suffered through a recent
divorce and a miscarriage the previous fall.  Id.

On May 23, 2001, Bruso again saw Dr. Bayer for treatment of
continuing back pain.  Tr. 266.  Bruso believed her prior pain
was distinct from this new pain, which Dr. Bayer described as
cervical discomfort with no radiation to the arms or resulting
weakness.  Id.  Upon examination, Dr. Bayer noticed slight back
tenderness at the C5 level, but all other musculoskeletal and

---

[3]  Otitis is "an inflamation of the ear."  Stedman's 1112.

neurological findings were normal.  Id.  An x-ray indicated mild disc space narrowing at the C5-6 level compatible with degenerative disease.  Id.  Dr. Bayer prescribed Ambien, Ativan, Wellbutrin, and Relafen.  Id.

At her next appointment, on June 22, 2001, Bruso told Dr. Bayer that aside from minor "fuzzy-headedness," she was responding well to her medication.  Tr. 270.  During the physical examination, Bruso presented decreased motion in her neck and continued tenderness in the C4 and C5 region.  Id.  Apart from stomach distress from the Relafan, the other examination findings were normal.  Id.  A July 10, 2001 colonoscopy was also normal. Id.

Bruso did not see Dr. Bayer again until October 3, 2001. Tr. 273.  At this appointment, Bruso complained of continued discomfort in her feet, which she alleged had worsened since August, and increased eczema on her hands.  Id.  Dr. Bayer noticed a rash on Bruso's hand and proscribed Triamcinolone cream.  Id.  An x-ray of her feet was negative.  Id.  Dr. Bayer's report of this visit does not indicate that Bruso complained of depression.  Id.

On November 28, 2001, Dr. Andrew Gersten conducted a

-5-

consultive psychological evaluation of Bruso on behalf of the
SSA.  Tr. 242.  In his report, Dr. Gersten first noted that Bruso
had arrived at the appointment independently and without
exhibiting any unusual mannerisms.  Id.  He further noted that
Bruso's gait and speech were unremarkable.  Id.  Bruso informed
Dr. Gersten during the examination that she had battled
depression sporadically throughout most of her life, but that her
condition had recently worsened to the point that she was fairly
depressed on a constant basis.  Tr. 243.  Bruso admitted,
however, that aside from four to five visits with a psychologist
eight years earlier, she had not sought hospital or outpatient
treatment for depression.  Id.  She also reported having no
intention of committing suicide for fear of the effect it would
have on her daughter.  Tr. 244.

Following the mental examination, Dr. Gersten noted that
Bruso had demonstrated adequate reasoning and judgment,
unimpaired short-term memory and concentration, and average
intellectual functioning.  Id.  The only noted complication was
in Bruso's performance in the serial sevens test.[4]  Id.  Based on

_____

[4]Neither party, nor the ALJ in his decision, properly
defined what the "serial sevens test" entailed or sought to

these findings, Dr. Gersten diagnosed Bruso with major

depression, moderate and recurrent.  Tr. 246.  He also stated,

however, that Bruso's prognosis was fair if she followed his

recommendation and sought psychotherapy.  <u>Id.</u>  Dr. Gersten

ultimately concluded that Bruso was capable of tolerating mild

work stressors, but was likely to become emotionally overwhelmed

with more intense stressors, such as interacting with

supervisors.  Tr. 245-246.

On the same day, Dr. Michael Schneider reviewed Bruso's

medical record and Gersten's report and concluded that while

Bruso appeared to have a severe impairment, it did not currently

meet or equal "Listing levels."[5]  Tr. 263.  He also noted that

Dr. Gersten appeared to "somewhat exaggerate that [Bruso] would

have difficulty and become emotionally overwhelmed with more

intense stressors."  <u>Id.</u>  More importantly, Dr. Schneider

determined that Bruso was capable of completing a normal workweek

"free from an unreasonably high number of disruptions to pace"

and to "accommodate to routine changes in a work setting."  <u>Id.</u>

---

diagnose.

[5]  The "Listing of Impairments" as located in Appendix 1 to
Subpart P of Regulations Part 404.

-7-

On December 17, 2001, Bruso was referred to Dr. Aaron S. Geller, a pain specialist, regarding her continued complaints of pain.  Tr. 307.  During this examination, Bruso complained of pain radiating from her neck, back, and right elbow.  Id.  On a scale of 1 to 10, with 10 being amputation level pain and 1 being no pain, Bruso quantified her pain as 3-4 for her neck, 6-7 for her back, and 7 for her right elbow.  Id.  X-rays of her cervical spine and feet, however, were unremarkable.  Id.  Dr. Geller also noted that a lumbar spine MRI[6] revealed no abnormalities.  Id.  Upon physical examination, Bruso's neck range of motion was within full functional limits, her motor strength was normal, and her reflexes appeared to be functioning appropriately.  Tr. 308.  Dr. Geller believed that Bruso's complaints of diffuse pain were consistent with fibromyalgia,[7] her foot pain was consistent with plantar fascitis,[8] and her elbow pain was consistent tendinitis.[9]

_____

[6]  This MRI was conducted at some undisclosed time and is not contained in the record.

[7]  Fibromyalgia is "a syndrome of chronic pain of musculoskeletal origin but uncertain cause, which requires point tenderness in at least 11 of 18 specified sites."  Stedman's Medical Dictionary 671 (27th ed. 2000) ("Stedman's 27th").

[8]  Plantar Fascitis can be loosely defined as an inflamation of the fibrous tissue located on the sole of the foot.  See

-8-

Tr. 309.  His report also noted that Bruso had comorbid insomnia, myofacial pain, and mood depression.  Id.

Bruso began physical therapy on January 23, 2002.  Tr. 303. Physical therapist Carol L. Wong evaluated Bruso and established a PT regimen which included manual physical therapy to the gastrocsoleus,[10] manipulation of the heel and foot area, and comprehensive stretching and strengthening one to two times per week for four to six weeks.  Tr. 304.  Wong gave Bruso a prognosis of fair to good if she followed this program.  Id. However, between this initial appointment and February 6, 2002, Bruso only attended four of her scheduled appointments, despite having acknowledged the positive effects that treatment had on some of her ailments.  Id.  Following February 6, 2002, she failed to attend physical therapy again.  Id.

---

Stedman's 1210, 568.

[9]  Tendinitis is "the inflamation of a tendon."  Stedman's 1561.

[10]  Gastrocnemius muscle; "*origin*, by two heads (caput laterale and caput mediale) from the lateral and medial condyles of the femur; *insertion*, with soleus by tendo calcaneus (achillis) into lower half of posterior surfaces of calcaneus; *action*, plantar flexion of foot; *nerve supply*, tibial." Stedman's 998.

On January 28, 2002, Bruso approached Dr. Geller about conducting a physical capacity evaluation in order for her to obtain Medicare coverage.  Tr. 310.  Dr. Geller insisted that Bruso first continue with a broader scope of physical therapy. Id.

Bruso saw Patricia K. Dahme, a nurse therapist, on February 14, 2002 for mental health counseling.  Tr. 296.  Dahme described Bruso as a casually dressed woman, with a flat affect and depressed mood, who regularly fidgeted and changed positions. Tr. 297.  Bruso admitted having passive suicidal ideation, but she conceded that she had no plan to act on these thoughts because of her daughter and her religion.  Id.  Dahme diagnosed Bruso as having major recurrent depression which she felt had only a moderate level impact on Bruso's ability to function.  Id. Bruso cancelled two subsequent appointments, the first on February 27, 2002 because of another "obligation," and the second on April 23, 2002 because she had a trip planned with her daughter.  Tr. 297-298.  In total, she attended only three appointments.  Id.

On February 25, 2002, Dr. Geller reexamined Bruso.  Tr. 312. She had begun taking Zoloft two weeks prior to the appointment

-10-

and had since developed grinding[11] during the day and at night.
Id.  At this time, she was also taking Zanaflex, Micronos,
Lorazepam, Ambien, and Tylenol.  Id.  After administering trigger
point injections, Dr. Geller again recommended that Bruso
continue with the physical therapy.  Tr. 313.

Bruso underwent a functional capacity evaluation on April
17, 2002.  Tr. 277.  The therapist who conducted the evaluation
described Bruso's functional capacity as part-time, sedentary.
Tr. 278.  Work restrictions included the need to (1) change
positions every 30 to 60 minutes; (2) avoid tasks below the 12-
inch level; (3) avoid overhead tasks; and (4) minimize reaching,
bending and twisting.  Id.  However, the therapist premised all
of his findings by stating, several times, that there had been
"sub-maximal effort on [Bruso's] behalf."  Id.

Dr. Geller and Bruso met to discuss the results of her
functional capacity evaluation on April 30, 2002.  Tr. 315.  Dr.
Geller informed Bruso that the evaluation "clearly stated that
she was able to work at least at a sedentary job."  Id.  Bruso

---

[11]  Although it is not described in the record, for the
purposes of this motion, I assume that "grinding" refers to
grinding of the teeth.

-11-

alleged that her pain had reached 10 out of 10 in intensity, but Dr. Geller nevertheless cleared her for full-time sedentary work. Id.  Bruso continued her prescriptions of MS Contin, Zonegran, Zoloft, Micronor, Lorazepam, Ambien, and Tylenol.  Id.

Bruso informed Dr. Geller on July 4, 2002 that although her pain medication had not entirely relieved her pain, she was able to do light yard work.  Tr. 316.  The physical examination findings from this visit were largely consistent with those of prior examinations.  Id.  Bruso also told Dr. Geller that she was not suffering any mood depression at this time.  Id.

On September 9, 2002, an MRI of Bruso's back disclosed severe spinal stenosis at C5-C6, with neural foraminal narrowing and impingement on the spinal cord.  Tr. 318.  Based on this new information, Dr. Geller determined, as he stated in the Physical Capacities Evaluation form dated November 12, 2002, that Bruso was incapable of even sedentary work.  Tr. 321.  He further determined that she was incapable of lifting and carrying more than 10 pounds, sitting or standing for more than two hours, or engaging in activities which involve excessive bending, twisting and crouching.  Id.  Dr. Geller also opined that Bruso must avoid all exposure to temperature extremes, wetness, humidity, fumes,

-12-

odors, dusts and gases, as well as machinery and heights.   Id.

## II.   **STANDARD OF REVIEW**

### A.   **Findings Entitled to Deference**

Pursuant to 42 U.S.C. § 405(g) a district court, following a timely request, may review the administrative record and "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."  42 U.S.C. § 405(g).  However, the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,"[12] must be held conclusive. Id.  It is also solely within the purview of the Commissioner to make determinations as to "credibility and to draw inferences from the record evidence."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  Accordingly, in reviewing the record for substantial evidence, a district court may not reweigh the evidence or substitute its own judgment for

---

[12]  Substantial evidence is "more than a mere scintilla of evidence;" it "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 597 (1st Cir. 1980)(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

that of the Commissioner's.   Id.

The reviewing court is not bound to the Commissioner's findings in all instances.  Where the Commissioner has committed some legal or factual error in her evaluation of the disability claim, deference will not be appropriate.  See Manso-Patzer v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Further, the ALJ's findings of fact will not be conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Cater, 172 F.3d 31, 35 (1st Cir. 1999)(citation omitted).

**B.   Parties' Respective Burdens**

An individual seeking Social Security disability benefits is disabled within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can reasonably be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  The claimant has the initial burden of demonstrating that she suffers under "a medically determinable impairment which disables [her] from performing the jobs [she] has done in the past."  Currier, 612 F.2d at 598.  To fulfill this burden, the claimant must show that

-14-

his or her impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382(c)(D).

In assessing a disability claim, the Commissioner considers objective and subjective factors, including: (1) objective medical facts; (2) the claimant's subjective assertions of pain and disability as supported by the testimony of the claimant and other witnesses; and (3) the claimant's educational background, age, and work experience.  Mandziej v. Cater, 944 F. Supp. 121, 129 (D.N.H. 1996)(citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986)).  The Commissioner then addresses these facts, through the rubric of the five-step sequential evaluation, to determine whether the claimant is disabled.  See 20 C.F.R. § 404.1520(a)(4).  Where a claimant has shown an inability to perform her previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that she can perform.  See Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).

I review Bruso's challenge with these principles in mind.

III.   **ANALYSIS**

Bruso argues that:  (1) the ALJ's decision that the
September 9, 2002 MRI did not support her claim of disability
prior to that date is not supported by substantial evidence; (2)
the ALJ failed to utilize the five step sequential evaluation
process mandated by 20 C.F.R. § 404.1520 in analyzing her alleged
mental disability; (3) the ALJ improperly discounted the findings
of the SSA's consulting medical expert; (4) the ALJ failed to
consider the side effects of her medications; and (5) the ALJ
failed to re-contact Dr. Geller to explain and clarify the
conflict between his opinion and the results of her functional
capacity evaluation.  I address each argument in turn.

**A.   The ALJ's Determination that the September 9, 2002 MRI
      Did not Substantiate Bruso's Claim Prior to that Date**

Bruso first argues that the disability disclosed by the MRI
of September 9, 2002 is of a degenerative nature and thus did
not, barring some severe trauma, appear instantaneously.  She
therefore concludes that the ALJ must have erred in determining
that her disability began at the instant the MRI was taken.  I
disagree.

-16-

"The onset date of disability is the first day an individual
is disabled as defined in the Act and the regulations."  S.S.R.
83-20, 1983 WL 31249 (S.S.A.).  With "disabilities of non-
traumatic origin, the determination of onset involves
consideration of the applicant's allegations, work history, if
any, and the medical and other evidence concerning impairment
severity."  Id.  "Medical evidence serves as the primary element
in the onset determination" and "should be considered in light of
the nature of the impairment."  Id.  Ultimately, the onset date
must be set on the date when it is most reasonable to conclude,
based on the facts and the medical record, "that the impairment
was severe enough to cause the inability to engage in substantial
gainful activity for at least twelve months."  Id.  However,
whenever it is consistent with all of the medical evidence, the
date alleged by the claimant should be used.  Id.

As a preliminary matter, I reject the assertion that Bruso's
alleged onset date of April 2000 should have been adopted by the
ALJ.  That date is inconsistent with the medical record on
several counts.  First, the May 2001 x-ray of Bruso's spine was
reviewed by no less than three medical experts, none of whom

noted anything more than mild degenerative disease.[13]  This evidence is more than sufficient to establish that as of May 2001, Bruso's degenerative disc disease had not yet reached disabling proportion.  Second, based on Dr. Geller's interpretation of the April 17, 2002 functional capacity evaluation, Bruso retained the RFC to perform full-time sedentary work.  Thus, because Bruso's treating physician determined she was capable of performing full-time work, sufficient evidence existed to suggest that her degenerative disease had not become disabling as of April 2002.  The proper question, therefore, is whether the date chosen by the ALJ is sustainable.

The ALJ found September 9, 2002 to be the onset date of disability because that was the day on which the MRI established, for the first time, "medically acceptable diagnostic evidence of a disabling condition."  Tr. 25.  In the ALJ's opinion, a finding for an earlier date was not warranted because prior to the MRI "the diagnostic evidence of record was routinely reported to be

---

[13] Contrary to inferences made by Bruso, x-ray is a common tool used in making preliminary diagnoses of spinal stenosis. See Healthwise  Inc., *Spinal Stenosis: Exams and Tests*, http://my.webmd.com/hw/back_pain/aa119024.asp (last accessed June 28, 2005).

unremarkable." Tr. 26.  I must affirm this decision if

substantial evidence exists to support the ALJ's decision that

September 9, 2002 is the most reasonable date of onset to be

inferred from the record.  See S.S.R. 83-20, 1983 WL 31249

(S.S.A.).

Contrary to Bruso's contentions, the ALJ did not act

arbitrarily in determining the onset date of her disability.   As

I have explained, Dr. Geller's April 30, 2002 decision to clear

Bruso for full time work supports the ALJ's determination that

she was not disabled prior to that date.  During her next

appointment, on June 4, 2002, Bruso informed Dr. Geller that, in

addition to having no mood depression, she was able to do light

yard work.  Tr. 316.  Yard work invariably involves physical

exertion closely akin to the stooping, bending, and crouching

specifically proscribed by Dr. Geller following the MRI.

Combined with Bruso's continuing decision to forgo recommended

physical therapy,[14] I find this evidence sufficient to support

---

[14] I reject in its entirety Bruso's argument that the MRI
substantiates all of her prior complaints of pain.  Had her pain
been as debilitating as she alleges, she would have continued
with the physical therapy she began in January of 2002, which she
admitted had a positive effect on her condition.  Her failure to
do so was reasonably interpreted by the ALJ as contradicting her

the ALJ's implicit ruling that Bruso was not disabled as of April 30, 2002.  Because the record contains no further evidence until the September 9, 2002 MRI, the date chosen by the ALJ is the most reasonable on which to affix onset.  Accordingly, the ALJ's inferred onset date is supported by substantial evidence.

**B.   The ALJ's Alleged Failure to Utilize the Five-Step Sequential Evaluation Process in Analyzing Bruso's Alleged Mental Disability**

Bruso next argues that the ALJ failed to utilize the five-step sequential evaluation process in his analysis of her alleged mental disability.  She contends that the ALJ merely dismissed the claim of mental impairment as lacking credibility without addressing its severity.  Again, I disagree.

In assessing a claim of disability, an ALJ must implement the "five-step sequential evaluation" as a framework for his analysis.  See 20 C.F.R. § 404.1520.  This requires the ALJ to address, in sequence, whether:  (1) the claimant is presently

---

subjective complaints of disabling pain.  See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) (per curiam) (affirming denial of benefits where claimant did not follow through with securing medical treatment); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming denial of benefits where claimant failed to heed doctor's diet recommendation which would have helped hypertension and headaches).

engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals a listed impairment; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from doing any other work.  Id.  In cases where a claimant alleges multiple impairments, the ALJ "will consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.

After determining that Bruso was not currently employed, the ALJ properly turned his attention to the severity of her impairments.  Bruso alleges that the "ALJ in his decision does not indicate whether the claimant's disability is severe."  This assertion is factually inaccurate.  The ALJ explicitly stated in his decision that Bruso had alleged she was suffering from depression, and, further, that this depression qualified as a "severe impairment."  Tr. 19. Bruso's argument is thus without merit.

The same must be said of Bruso's claims with respect to the ALJ's step three analysis.  There, the ALJ assessed whether Bruso's alleged impairments met, or were equal to, the criteria

of the "Listing of Impairments."  Answering this question, the
ALJ determined that "[Bruso's] impairments, both singly and *in
combination*, do not meet or equal the severity of any listing
described in the appropriate section."  Tr. 20 (emphasis added).
This statement clearly contradicts any claim that the ALJ
disregarded the combined effects of Bruso's alleged impairments.

Bruso also asserts that the ALJ improperly addressed her RFC
to perform prior work.  Tr. 20.  She alleges that the ALJ failed
to state with specificity the basis for his determination that
her allegations of mental impairment were not credible, in breach
of Social Security Ruling 96-7p.  Bruso is incorrect.  Social
Security Ruling 96-7p requires an ALJ, in making a credibility
determination, to state "specific reasons for the finding of
credibility . . . [which] make clear to the individual and any
subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight."  S.S.R.
96-7p, 1996 WL 374186 (S.S.A.).  The ALJ's decision contains no
fewer than five paragraphs of analysis which relate, in some way,
to the credibility of Bruso's allegations of disabling

depression.[15]   Tr. 22-23.   This more than adequately puts Bruso,

and any subsequent reviewers, on notice as to why the ALJ drew

the conclusions he did.

Bruso maintains that the ALJ nevertheless erred by failing

to consider the combined effects her alleged mental impairment

and her complaints of pain would have on her RFC.   However, this

argument is premised on a misunderstanding of 20 C.F.R. §

404.1523.   In addressing a claim in which several ailments are

alleged, an ALJ only needs to consider the effect of impairments

that are found to be credible.   See Williamson v. Califano, 487

F. Supp. 308, 313 (W.D. Mo. 1980) ("[An ALJ] could not be

expected to consider the impairments and complaints that he found

were not credible").   To require an ALJ to do otherwise would

undermine the ALJ's established authority over questions of

credibility.

---

[15]   The ALJ pointed to, *inter alia*, the medical evidence
which seemed to indicate that Bruso's depression was only related
to traumatic events in her life, the fact that Bruso had
described her depression as seasonal, the lack of any ongoing
psychological treatment, statements by Bruso to her doctors that
her medication was improving her condition, at least one doctor's
appointment at which she indicated she was not feeling depressed,
and Bruso's ability to maintain a full social life with her
daughter.

Because the ALJ properly considered and rejected Bruso's allegations of depression, I decline to remand on this issue.

C.   **The Findings of the SSA's Medical Expert**

Bruso's third argument is that the ALJ improperly dismissed the opinion of Dr. Gersten in favor of his own opinion.  As with her first two arguments, I disagree.

An ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion." Nguyen, 172 F.3d at 35.  That is not to say, however, that an ALJ will be bound by a medical professional's determination that a claimant is "disabled" or "unable to work".  See S.S.R. 96-5p, 1996 WL 374180 (S.S.A.).  "Because these are administrative findings, that may determine whether an individual is disabled, they are reserved to the Commissioner."  Id.  While a medical source's opinions on such matters must not be disregarded, they "can never be entitled to controlling weight or given special significance."  Id.

After considering Dr. Gersten's diagnosis in conjunction with the medical record, the ALJ determined that he could not give Dr. Gersten's opinion "controlling weight."  Bruso charges that this decision was predicated on the ALJ's subjective medical

-24-

opinions.  On the contrary, I find that this conclusion is supported by a sufficient evidentiary basis.

First, as the ALJ explained, the record lacks a longitudinal history of the limitations Dr. Gersten described.  For instance, Dr. Gersten opined that Bruso could become overwhelmed by having to interact with supervisors, but the record "fails to . . . document any history of difficulty dealing with supervisors." Tr. 23.  Further, the ALJ determined there was sufficient evidence in the record to support a contrary finding.  In support of this proposition, the ALJ cited to Bruso's failure to seek professional treatment for depression, her cancellation of counseling appointments, her acknowledged improvement with medication, and her ability to maintain a relatively full social life.

Moreover, Dr. Gersten's opinion was controverted by Dr. Schneider's.  After examining the record, Dr. Schneider determined that Dr. Gersten had exaggerated the degree to which Bruso would have difficulty handling interactions with supervisors.  Tr. 263.  In Dr. Schneider's opinion, Bruso was capable of "complet[ing] a normal workweek free from an unreasonably high number of disruptions to pace."  Id.  The ALJ

reasonably found this diagnosis to be more in accord with the record.  I decline to disturb this conclusion because it is solely "[the ALJ's] function to resolve conflicts among the opinions of various treating and examining physicians."  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001).

**D.    The Side Effects Of Bruso's Medication**

Bruso also argues that the ALJ failed to consider the side effects of her medications.  She contends that there was only one isolated mention of medicinal side effects in the ALJ's decision, and therefore that her case must be remanded for redetermination. I disagree.

In determining the extent to which a claimant's symptoms affect his or her capacity to work, an ALJ must consider all of the available evidence in the record.  <u>See</u> 20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p, 1996 WL 374186 (S.S.A.).  "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [an ALJ] will carefully consider any other information [a claimant] may submit about [their] symptoms."  20 C.F.R. § 404.1529(c)(3).  One factor that must always be considered is the "type, dosage, effectiveness and side effects of any medication" a claimant has

taken to alleviate her pain.   20 C.F.R. § 404.1529(c)(3)(iv).

In recognition of this duty, the ALJ assessed all of the medical evidence presented and proceeded to find that there was no indication that Bruso's "medication caused any significant side effect."  Tr. 23.  This carefully chosen language encompasses an acknowledgment of the very issue Bruso asserts the ALJ ignored.  Had the ALJ failed to realize Bruso had taken medications at all, he would have merely stated that no side effects were present.  Thus, the record fails to support Bruso's claim that the ALJ completely ignored her medicinal side effects.

### E.   Bruso's RFC Evaluation

Bruso's final argument is that Dr. Geller's decision to clear her for full-time sedentary, and light-duty work was inconsistent with the results of her RFC evaluation.  She contends that this ambiguity gave rise to a duty on the ALJ's part to conduct a further inquiry pursuant to Social Security Ruling 96-5p.  I again disagree.

Social Security Ruling 96-5p states, in relevant part, "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the

adjudicator must make every reasonable effort to recontact the source for clarification of the reasons for the opinion."  S.S.R. 96-5p, 1996 WL 374180 (S.S.A.).  Therefore, only in instances where there is both a lack of evidentiary basis for a treating source's opinion and an inability, on the part of the adjudicator, to ascertain the basis of the opinion, should an inquiry be required.

I conclude there is no lack of evidentiary basis for Dr. Geller's findings in this case because his professional opinion is completely reconcilable with the RFC evaluation conducted on April 22, 2002.  Contrary to the interpretation promoted by Bruso, the RFC evaluation did not merely state that Bruso was limited to no more than part-time work.  In fact, the therapist who conducted the examination noted, on more than one occasion, that Bruso had exhibited sub-maximal effort and that "any final vocational . . . decisions for Ms. Bruso should be made with this in mind."  Tr. 277.

An objective reading of this RFC evaluation indicates that Bruso had "provided less than full physical effort during testing" and yet still managed to display the RFC to do sedentary work on a part-time basis.  Tr. 278.  One reasonable inference to

be made from this evaluation is that Bruso would have demonstrated the capacity for full-time work had she given full exertion.  This is exactly what Dr. Geller found.

Because I find no ambiguity between Dr. Geller's opinion and the results of the RFC evaluation, I deny remand on this issue.

## IV.  <u>CONCLUSION</u>

Because the ALJ's denial of Bruso's benefits prior to September 9, 2002 is supported by substantial evidence, I affirm the Commissioner's decision.  Accordingly, Bruso's Motion to Reverse (Doc. No. 7) is denied, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 8) is granted.  The clerk shall enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 29, 2005

cc:  David Broderick, Esq.
     Jeffry Schapira, Esq.